Free UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RED RIVER AG, LLC, individually and on behalf of all persons similarly situated,

Plaintiff,

v.

NUTRIEN LTD.; NUTRIEN AG SOLUTIONS, INC.; THE MOSAIC CO.; MOSAIC FERTILIZER, LLC; CANPOTEX LTD.; YARA INTERNATIONAL ASA; YARA NORTH AMERICA, INC.; CF INDUSTRIES HOLDINGS, INC.; CF INDUSTRIES NITROGEN, LLC; CF INDUSTRIES INC.; KOCH INDUSTRIES, INC.; KOCH AG & ENERGY SOLUTIONS, LLC; KOCH AGRONOMIC SERVICES, LLC; THE FERTILIZER INSTITUTE; and INTERNATIONAL FERTILIZER ASSOCIATION,

Defendants.

Case No.

CLASS ACTION COMPLAINT

JURY TRIAL DEMAND

Plaintiff Red River Ag, LLC, on behalf of itself and all others similarly situated, brings this Class Action Complaint ("Complaint") for damages and injunctive relief against Defendants Nutrien Ltd. and Nutrien AG Solutions (together, the "Nutrien Defendants"); The Mosaic Co. and Mosaic Fertilizer, LLC (together, the "Mosaic Defendants"), CF Industries Holdings, Inc.; CF Industries Nitrogen, LLC; CF Industries Inc. (together, the "CF Industries Defendants"); Koch Industries, LLC, Koch AG & Energy Solutions, LLC; and Koch Agronomics Services, LLC (together, the "Koch Defendants"); Yara International ASA and Yara North America, Inc. (together, the "Yara Defendants"); Canpotex Ltd.; International Fertilizer Association; and The Fertilizer Institute, and states as set forth below.

## I. INTRODUCTION

1. The Nutrien Defendants, the Mosaic Defendants, CF Industries Holdings, Inc., the Koch Defendants, the Yara Defendants, and Canpotex collectively dominate the production, manufacturing, distribution, and sale of Fertilizer Products throughout the United States. These Defendants control the three most widely used types of Fertilizer: Nitrogen, Potash, and Phosphate (collectively, "Fertilizers"), which are used both independently and in combination with other elements to create Fertilizer Products. Together, the Defendants control 82 percent of the Nitrogen Fertilizer market, 90 to 95 percent of the Potash Fertilizer market, and 91 percent of the Phosphate Fertilizer market in the United States. The Defendants have conspired to use their market power to artificially suppress supply of all three Fertilizers, which enabled them to artificially raise prices and reap supracompetitive profits.

2. Beginning on or around January 1, 2020, Defendants entered into an agreement, combination, or conspiracy to fix prices above competitive levels and limit supply of Nitrogen, Potash, and Phosphate Fertilizers. Plaintiff and members of the Class were thus forced to pay

Defendants' artificially inflated prices for Fertilizer Products and have suffered injuries under the federal antitrust laws.

3. Defendants' conspiracy has forced farmers to make an impossible choice: pay astronomically high prices for the Fertilizers necessary to grow essential crops or not plant those crops at all. Farmers, who have long faced rising costs and ballooning debt, have been pushed to the brink. Meanwhile, Defendants have been able to restrict supply and raise prices uninhibitedly, using their market dominance to form a united front. They have focused on raising prices, which have soared above historical levels, and they have erected and relied on high barriers to entry to insulate them from competition.

4. Before January 1, 2020, Fertilizer prices closely tracked grain prices, specifically, corn and wheat. As the prices that farmers could charge for grains rose, so too did Fertilizer prices. The two are tied because when grain prices rise, farmers are likely able or willing to invest more in Fertilizer to increase crop yields.

5. Yet in 2020, Defendants began to raise prices without any corresponding grain price increases. In other words, Defendants raised prices untethered from supply and demand. In the fall of 2021 and through 2022, prices for Fertilizer reached record highs. To some extent, grain prices had risen, too. But not to the drastic heights of Fertilizer prices. As grain prices decreased and stabilized, farmers expected that Fertilizer prices would do so as well. Not so. Defendants capitalized on the surge. Though prices decreased some in 2023, they remained elevated above pre-2020 prices and have continued at this level through early 2026.

6. There was no obvious reason for the price spikes, nor for the sustained higher prices. Though Defendants have claimed that price hikes were the result of external forces on their supply chains and increased input costs, such as increases in natural gas prices, their

financial reports reflect that the price hikes for Fertilizer Products far outpaced these increased costs. And while natural gas is a significant input cost for Nitrogen Fertilizer Products, it is not a significant input cost for the other two types of Fertilizer Products, Phosphate and Potash. Nonetheless, Defendants raised the prices for these Fertilizer Products all the same. Defendants themselves conceded this: companies saw increased profitability in 2022, including in their Nitrogen sectors, which were attributed to "[h]igher net realized selling prices [that] more than offset higher natural gas costs."[1]

7. Government officials took note. In 2021, Senator Chuck Grassley, alongside nonpartisan, farmer-led oversight organization Farm Action, demanded that the Department of Justice ("DOJ") investigate high Fertilizer prices. They raised concerns that American farmers were being harmed by possible anticompetitive activity and market manipulation by the Fertilizer industry's giants. Senator Grassley wrote, "[f]ertilizer is an essential input for farmers across the country. Without fertilizer, crop yields and agricultural productivity would be significantly reduced. I have heard numerous concerns . . . that fertilizer companies are colluding and unfairly raising the price of their products."[2]

8. In 2021, President Biden signed an Executive Order on Promoting Competition in America's Economy. Part of the Executive Order directed the United States Department of Agriculture ("USDA") to examine "consolidation in the agricultural industry . . . making it too hard for small family farms to survive."[3] In response, in March 2022, the USDA solicited

---

[1] Press Release: "Nutrien Delivers Earnings Growth and Expects Strong Market Fundamentals in 2023" (Nov. 2, 2022), https://www.nutrien.com/news/press-releases/nutrien-delivers-earnings-growth-and-expects-strong-market-fundamentals-in-2023-1655.

[2] Dec. 15, 2021 Ltr. from Sen. Charles E. Grassley to Attorney General Merrick Garland, available at https://www.grassley.senate.gov/imo/media/doc/grassley_to_justice_dept.fertilizer.pdf.

[3] Promoting Competition in America's Economy, Executive Order 14036 (July 9, 2021), available at https://www.federalregister.gov/documents/2021/07/14/2021-15069/promoting-competition-in-the-american-economy.

comments from agricultural producers regarding concentrated market power in the markets for seed, Fertilizer, other agricultural inputs, and agricultural retail. The USDA received more than 1,600 comments. Market participants described concerns about high prices; the power of Fertilizer manufacturers, including Defendants; restrictive contract practices; and economic harms.

9. In October 2025, the U.S. Senate Judiciary Committee conducted a hearing on the issue entitled "Pressure Cooker: Competition Issues in the Seed & Fertilizer Industries." And just a few months later, in January 2026, USDA Deputy Secretary Stephen Vaden stated that the Fertilizer market is dominated by a "duopoly," which had "constrain[ed] fertilizer supply . . . and driv[en] up the costs that farmers are paying," adding that the administration would not allow these companies "to undermine" new market entrants seeking to increase supply.[4]

10. On March 4, 2026, Bloomberg reported that the DOJ has begun investigating the U.S. Fertilizer Market, including all Defendants, for price fixing Fertilizer Products.

11. Through the conduct described in this Complaint, Defendants have materially restricted supply and raised prices for Fertilizers, coordinating to achieve record profits at the expense of farmers and other market participants.

## II. <u>PARTIES</u>

**Plaintiff**

12. Plaintiff Red River Ag, LLC is a Minnesota limited liability company with its principal place of business in Plummer, Minnesota. Red River Ag, LLC purchased Fertilizer Products at artificially inflated prices directly from one or more of the Defendants during the Class Period defined herein.

---

[4] *A Conversation with USDA Deputy Secretary Stephen Vaden* (Jan. 21, 2026), recording available at https://nationalaglawcenter.org/webinars/vaden/.

**Nutrien Defendants**

13. Nutrien Ltd. ("Nutrien") is a Canadian corporation headquartered in Saskatoon, Saskatchewan. Initially established as a public corporation in 1975, Nutrien's predecessor company, PotashCorp, privatized in 1990 and subsequently acquired several U.S Fertilizer producers, including Potash Company of America, TexasGulf, and White Springs Agricultural Chemicals. In 2018, PotashCorp merged with another major Potash producer, Agrium, to become Nutrien. The goal of the merger was to form an "agriculture giant" that could respond to, and increase, falling Fertilizer prices.[5] Following the merger, Nutrien became one of the largest Fertilizer producers and distributors in the world. Nutrien is the largest producer of Potash Fertilizer Products and the second largest producer of Nitrogen Fertilizer Products. Nutrien operates six Potash mines, 12 Nitrogen facilities, and six Phosphate facilities in North and South America and Australia.

14. Nutrien Ag Solutions, Inc. ("Nutrien Ag," and collectively with Nutrien, the "Nutrien Defendants") is a wholly owned principal subsidiary of Nutrien Holdings, Inc., incorporated in Delaware with its principal place of business in Colorado. Nutrien Ag is the retail and distribution arm of Nutrien Ltd. Nutrien Ag is the largest retailer of Fertilizer Products and is estimated to represent 20% of the agricultural retail sales in the United States.

15. Together, the Nutrien Defendants are vertically integrated: Nutrien Ag maintains over 2,000 retail locations, including 1,500 in the United States, which sell Fertilizer Products and other crop inputs directly to consumers.

---

[5] CBC News, "Potash Corp., Agrium Agree to Merger that Would Create $36B Agriculture Giant" (Sept. 12, 2016), https://www.cbc.ca/news/business/potash-agrium-merger-1.3757953.

16. During the Class Period, the Nutrien Defendants sold Nitrogen, Phosphate, and Potash Fertilizer Products directly to customers in the United States, including members of the Class.

**Mosaic Defendants**

17. The Mosaic Company ("Mosaic") is a public corporation incorporated in Delaware, with its offices and principal place of business located at 101 E. Kennedy Boulevard, Suite 2500, Tampa, Florida.

18. Mosaic was formed in October 2004 by a merger between IMC Global, a Fertilizer company, and Cargill's crop nutrition division. In 2013, Mosaic Company agreed to buy CF Industries' phosphate business for $1.4 billion in cash. In 2016, Mosaic acquired Vale S.A. Vale Feritilizantes. Mosaic has been a major North American producer of Phosphate and Potash Fertilizer Products ever since.

19. Mosaic Fertilizer, LLC ("Mosaic Fertilizer" and collectively with Mosaic, the "Mosaic Defendants") is a company incorporated in Delaware with its principal place of business located at 12800 Whitewater Drive, Suite 200, Minnetonka, Minnesota. Mosaic Fertilizer is a subsidiary of Mosaic that produces Fertilizer Products in the United States.

20. During the Class Period, the Mosaic Defendants sold Phosphate and Potash Fertilizer Products directly to customers in the United States, including members of the Class.

**Canpotex**

21. Canpotex Ltd. ("Canpotex") is a Canadian corporation headquartered in Saskatoon, Saskatchewan. Canpotex was formed in 1972 as a joint export group for Canadian Potash producers to market, coordinate sales, and distribute Canadian Potash in response to oversupply and declining prices in the 1960s.

22. Canpotex was, for decades, owned by three Canadian companies and served as the global marketer of Potash from Saskatchewan, home to one of the world's biggest Potash mines. Many characterize Canpotex as a "legalized cartel for controlling potash prices."[6] Instead of trading Potash Fertilizer Products "through open markets, Canpotex negotiates long-term, often secret, pricing agreements with customers."[7] And when buyers try to demand lower prices, Canpotex "often throttle[s] back production to restrict supply."[8]

23. Today, Canpotex is a joint venture solely between Nutrien Ltd. and Mosaic Canada Corp Nutrition, LP (a wholly owned subsidiary of Mosaic). Canpotex acts as the exclusive export marketing and logistics arm for these two companies' sales of Potash outside North America. Through Canpotex, these producers coordinate the international sale, transportation, and distribution of Potash Fertilizer, including arranging shipping, negotiating contracts with large buyers, and allocating export volumes among its shareholders, for sales of Potash outside of North America.

24. Mosaic, though based in Florida, mines nearly all its Potash in Saskatchewan, and sells it via Canpotex through its 50/50 partnership with Nutrien.

**Yara Defendants**

25. Yara International ASA ("Yara") is a publicly traded Norwegian company with a principal place of business in Norway. Yara is a significant producer of Nitrogen Fertilizer.

26. Yara North America, Inc. ("Yara NA," and collectively with Yara, the "Yara Defendants") is a wholly owned subsidiary of Yara International ASA, with its principal place of business located at 100 N Tampa Street, Suite 3800, Tampa, Florida.

---

[6] Ian Austen, *Takeover Bid Shines Spotlight on Crucial Player in Potash*, N.Y. Times (Sept. 10, 2010), https://www.nytimes.com/2010/09/10/business/global/10potash.html.
[7] *Id.*
[8] *Id.*

27. During the Class Period, the Yara Defendants sold Nitrogen Fertilizer Products directly to customers in the United States, including members of the Class.

**CF Industries Defendants**

28. CF Industries Holdings, Inc. ("CF Industries") is a public corporation incorporated in Delaware with its principal place of business at 4 Parkway North, Suite 400, Deerfield, Illinois. CF Industries is one of the largest producers of Nitrogen Fertilizers products and is the largest producer of ammonia-based products.

29. CF Industries Holdings, Inc. is the majority owner of CF Industries Nitrogen, LLC, holding approximately 89 percent of the company's equity, while agricultural cooperative CHS Inc. owns the remaining interest. CF Industries Nitrogen, LLC is a Delaware limited liability company headquartered in Northbrook, Illinois.

30. CF Industries Inc. is a wholly owned subsidiary of CF Industries Holdings, Inc. and is incorporated in Delaware, with its principal place of business located at 2375 Waterview Dr., Northbrook, Illinois. CF Industries operates nine manufacturing complexes and 17 ammonia plants, the largest of which is in Louisiana. On July 1, 2015, CF Industries announced an agreement to complete an acquisition of all interests in GrowHow, a U.K.-based Fertilizer manufacturer, from Yara International for $580 million.

31. During the Class Period, the CF Industries Defendants sold Nitrogen Fertilizer Products directly to customers in the United States, including members of the Class.

**Koch Defendants**

32. Koch Ag & Energy Solutions, LLC ("Koch") is a limited liability corporation incorporated in Delaware with its principal place of business at 4111 E. 37th St. N., Wichita, Kansas. Koch Ag & Energy Solutions was previously known as Koch Fertilizer, LLC. In 2024,

Koch Industries changed the name, with the newly renamed entity serving as a holding company for Koch's Fertilizer, energy services, and methanol businesses.

33. Koch Ag & Energy Solutions is owned by Koch Industries, Inc. Koch Industries is one of the largest private companies in the U.S., with annual revenues of more than $115 billion. Brothers Charles and David Koch are the majority owners in the company. The company is famously private, preferring to avoid the disclosure obligations of public companies. Indeed, Charles Koch has stated that the company would go public "over my dead body."[9]

34. Koch Agronomic Services, LLC (collectively with Koch Ag & Energy Solutions and Koch Industries, the "Koch Defendants") is a Delaware limited liability company with its principal place of business in Wichita, Kansas. KAS is a wholly owned subsidiary of Koch Ag & Energy Solutions, LLC.

35. The Koch Defendants are major producers of Nitrogen Fertilizers.

36. During the Class Period, the Koch Defendants sold Nitrogen Fertilizer Products directly to customers in the United States, including members of the Class.

**The Fertilizer Institute**

37. The Fertilizer Institute ("TFI") is a U.S.-based trade association representing manufacturers, wholesalers, retailers, and other participants in the Fertilizer industry. TFI is headquartered at 4201 Wilson Boulevard, Suite 700, Arlington, Virginia. The CF Industries Defendants, Koch Defendants, Mosaic Defendants, Nutrien Defendants, and Yara Defendants are all members of TFI.

38. TFI provides a centralized forum for Defendants to meet, communicate, and exchange Fertilizer industry information, including member-exclusive data and analysis

---

[9] *Summer 2006 Openers*, Family Business Magazine (June 30, 2006), https://familybusinessmagazine.com/ownership/legal/summer-2006-openers-1/.

regarding Fertilizer production, supply, and demand. TFI also hosts conferences and members-only events attended by Defendants' senior executives and decisionmakers responsible for Fertilizer pricing and output decisions. These events afford recurring opportunities for competitors to share competitively sensitive information and monitor each other's conduct, thereby facilitating coordination of Fertilizer pricing.

39. During the Class period, and at all prior relevant times, TFI participated in Defendants' alleged conspiracy as detailed herein by facilitating the exchange of confidential, proprietary, and competitively sensitive information among Defendants.

**International Fertilizer Association**

40. The International Fertilizer Association ("IFA") is a global trade association representing participants across the Fertilizer industry. IFA is incorporated in the United Kingdom and maintains its headquarters in Paris, France. Nearly all Defendants in this action are members of IFA. This includes members of the CF Industries Defendants, Koch Defendants, Mosaic Defendants, Nutrien Defendants, Yara Defendants, and TFI.

41. IFA serves as a central coordinating body that brings together producers, distributors, and other market participants in Fertilizer markets through committees, working groups, and industry forums. IFA regularly collects, aggregates, and disseminates detailed industry data, including information relating to production, capacity, demand, and trade flows. This information is shared with members through proprietary platforms and periodic reports, providing participants with visibility into market conditions and trends. Through these mechanisms, IFA facilitates ongoing, recurring interaction among competitors.

42. During the Class period, and at all prior relevant times, IFA participated in Defendants' alleged conspiracy as detailed herein by facilitating the exchange of confidential, proprietary, and competitively sensitive information among Defendants.

## III. AGENTS AND CO-CONSPIRATORS

43. Various individuals, partnerships, corporations and associations not named as Defendants in this Complaint have participated as co-conspirators in the violations of law alleged herein and have performed acts and made statements in furtherance thereof. The identity of all co-conspirators is unknown at this time and will require discovery.

44. The anticompetitive and unlawful acts alleged against the Defendants in this Complaint were authorized, ordered, or performed by Defendants' respective officers, agents, employees, or representatives.

45. Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers or acquisitions.

46. Each corporate Defendant's agents operated under the authority and apparent authority of its respective principals.

47. Each corporate Defendant, through its respective subsidiaries, affiliates, and agents, operated as a single unified entity.

48. Various persons and/or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof. Defendants are jointly and severally liable for the acts of these co-conspirators, whether or not they are named as Defendants in this Complaint.

49. Each Defendant acted as the principal or agent of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

50. When Plaintiff refers to a corporate family or companies by a single name in alleging participation in the conspiracy, Plaintiff is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial acts or meetings on behalf of all the Defendant companies within that family. Because Defendants market themselves as corporate families, individual participants in the conspiratorial acts did not always know the corporate affiliation of their counterparts, nor did they recognize the distinction between the entities within a corporate family. Thus, all Defendant entities within the corporate families were active, knowing participants in the conspiracy to maintain supracompetitive prices of Nitrogen, Potash, and Phosphate Fertilizer Products.

## IV. JURISDICTION AND VENUE

51. This case arises under Section 1 of the Sherman Act (15 U.S.C. § 1) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 & 26). Plaintiff seeks treble damages for its injuries, and those suffered by members of the proposed Class, resulting from Defendants' anticompetitive conduct; to enjoin Defendants' anticompetitive conduct; and for such other relief as is afforded under the laws of the United States.

52. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337(a), and pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

53. This court has personal jurisdiction over each Defendant because each Defendant has transacted business, maintained substantial contacts, and committed acts in furtherance of their conspiracy in this District and throughout the United States. The conspiracy was directed at, and had the intended effect, of causing injury to Plaintiff and members of the proposed Class defined herein in this District and throughout the United States.

54. Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act (28 U.S.C. §§ 15, 22, and 26), and pursuant to 28 U.S.C. § 1391(b), (c), and (d), because one or more Defendants resided, transacted business, could be found, or had agents in this District, and because a substantial portion of interstate commerce affected by the conspiracy alleged herein occurred in this District.

55. Defendants' alleged conduct had a substantial effect on interstate commerce by inflating Fertilizer Product prices, restricting output, and impairing competition, thereby harming members of the Class throughout the United States.

## V. FACTUAL ALLEGATIONS

### A. Fertilizer and Food Systems

56. Industrialized food production systems worldwide rely on Fertilizer to grow at the volume necessary to meet the world's food needs. Providing sufficient and nutritious food is critical to reducing hunger, both globally and in the United States.

57. Fertilizer is essential to increasing crop yield and addressing food needs. Commercial Fertilizers contribute to up to 50 percent of global crop yields. On average, Fertilizer application improves crop yield by nearly 31 percent and nutritional quality by almost 12 percent. Without Fertilizer, Americans—and the world—would struggle to maintain sufficient food supply.

58. The adoption of Fertilizers played a key role in increasing crop yields. According to studies in the United States, 40 to 60 percent of agricultural yields can be attributed to the use of Fertilizers. This improvement in crop yields has lowered food costs and reduced hunger worldwide.

59. Consequently, Fertilizers are an essential input for crop yields and must be applied seasonally to meet domestic and global food needs. But when Fertilizer becomes too

expensive, farmers are forced to make tough choices between planting a crop they may not be able to afford to grow and not planting the crop at all.

**B. Fertilizer Types**

60. There are three types of Fertilizer, typically applied as a single component or a blend of three different plant nutrients: Nitrogen, Potassium (Potash), and Phosphate. These Fertilizer types may also be used in combination with other nutrients, like calcium, to offer plants additional complementary nutrients.

61. Nitrogen Fertilizer is produced through what is known as the Haber Bosch process, by first capturing the element nitrogen from the air and then combining it with hydrogen from natural gas to create ammonia, which is the feedstock for all other Nitrogen Fertilizer Products.

**Figure 1. Diagram of the Haber-Bosch process (A) and a simplified scheme showing different nitrogen fertilizers and products obtained from anhydrous ammonia (B). N: nitrogen; MAP: monoammonium phosphate; DAP: diammonium phosphate; UAN: urea-ammonium nitrate.**




62. The most widely used Nitrogen Fertilizers include anhydrous ammonia, urea, urea ammonium nitrate ("UAN"), and ammonium. These Fertilizers are commonly described and marketed based on the percentage of nitrogen they contain by weight. Anhydrous ammonia is the most concentrated Nitrogen Fertilizer product, typically containing 82 percent nitrogen. Urea

generally contains approximately 46 percent nitrogen. UAN solutions, liquid Fertilizers produced by combining urea and ammonium nitrate with water, are commonly sold in formulations such as UAN-28 and UAN-32, containing approximately 28 percent and 32 percent nitrogen, respectively. Ammonium nitrate Fertilizers typically contain approximately 34 percent nitrogen. These Nitrogen Fertilizers are widely used by farmers and agricultural distributors in the United States as interchangeable sources of Nitrogen depending on application method, timing, and agronomic conditions. These Nitrogen Fertilizers may also be combined with other nutrients.

63. Potash is produced by mining potassium salts and refining them with sulfuric acid. Commercial Potash is primarily produced as potassium chloride. A common form of potassium chloride is muriate of potash ("MOP"), which is typically sold in concentrations of 60 percent Potash (specifically, potassium oxide).




64. Phosphorus is derived from phosphate rock, which is converted into phosphoric acid and elemental phosphorous before it is refined with superphosphates. The most widely used Phosphate Fertilizer Products include diammonium phosphate ("DAP"), monoammonium

phosphate ("MAP"), and triple superphosphate ("TSP"), all of which are typically sold in dry granule form. Another common Phosphate Fertilizer Product is ammonium polyphosphate ("APP"), which is produced in liquid form.

65. The USDA has distilled the processes for producing each of these Phosphate products as follows:

Figure 1
**Fertilizer production processes and the role of natural resources**




Source: USDA, Economic Research Service using information derived from Central Farmers Industries (2023), Crop Nutrition (2024b), Fertilizers Europe (2023), Florida Industrial and Phosphate Research Institute (2024), Hancock (2022), and University of Minnesota Extension (2024).

66. The three nutrients are used separately or in tandem for optimal plant nutrition. Nitrogen promotes protein formation, ensuring plants are healthy as they develop. Phosphate enables plants to better use and store energy, ensuring adequate photosynthesis. Potash strengthens plants' abilities to resist disease and increases overall crop yields and quality. Farmers must use a balance of one or more for plants to thrive.

### C. Defendants' Conspiracy to Inflate Fertilizer Prices

#### 1. Defendants Raised Fertilizer Prices in Tandem in 2021, and They Have Remained Elevated Ever Since

67. Beginning in or around 2020, Fertilizer pricing patterns diverged from historical norms. For decades prior, Fertilizer prices tended to rise and fall in response to ordinary market forces such as input costs, crop demand, and seasonal planting cycles. Thereafter, prices for Nitrogen, Phosphorus, and Potash Fertilizer Products each increased rapidly and simultaneously across the market

68. Prices for Fertilizer Products surged during 2021 and 2022 and then, after declining modestly in 2023, rose again in 2024 and continuing into 2025.

69. The Producer Price Index, an economic indicator published by the U.S. Bureau of Labor Statistics that measures industry average selling prices over time, reflects similar price increases across the Fertilizer Manufacturing industry:




70. In competitive markets, unusually high prices typically trigger increased production and expanded supply as producers attempt to capture additional profits. Yet Fertilizer prices have remained elevated even as the market conditions that Defendants cite as explanations

for price increases, *e.g.*, supply disruptions and raw material input cost increases (discussed at length below), eased.

71. Upon information and belief, rather than expanding production to take advantage of high prices, Defendants maintained tight supply conditions while Fertilizer prices remained at historically elevated levels. This sustained price elevation across multiple Fertilizer markets is consistent with coordinated conduct designed to maintain supracompetitive pricing.

72. In 2021, the wholesale fertilizer index increased by more than 60 percent compared to 2020, and in 2022, wholesale fertilizer prices grew even more, averaging 132 percent higher than 2020 prices.

73. Several of the Nitrogen Fertilizer-producing Defendants admitted to increasing prices in similar amounts throughout 2021 and 2022:

a. CF Industries reported in its 2022 Annual Report that average prices in its ammonia segment increased 87 percent, from $498 per ton in 2021 to $936 in 2022; average granular urea prices increased 45 percent, from $438 per ton in 2021 to $633 in 2022; average UAN prices increased 93 percent, from $272 per ton in 2021 to $526 in 2022; and average ammonium nitrate prices increased 78 percent from $297 per ton in 2021 to $530 in 2022.

b. Around the same time, Nutrien reported similar average Nitrogen Fertilizer Product prices hikes when it reported its Fourth Quarter 2022 and Full-Year 2022 Results: average ammonia prices increased 104 percent year-over-year, from 2021 to 2022, from $477 per ton in 2021 to $973 in 2022; average urea prices increased 46 percent, from $478 per ton in 2021 to $696 in 2022; and average prices for “Solutions, nitrates and sulfates” increased 69 percent, from $238 per ton in 2021 to $402 in 2022.

74. The Potash and Phosphate Fertilizer-producing Defendants admitted to similar average price increases during this time as well:

a. Reporting its average sales prices in their Phosphate Fertilizer segments in February 2023, Nutrien reported a 34 percent year-over-year increase in average sales prices from 2021 to 2022 (from $602 per ton in 2021 to $806 in 2022), while Mosaic reported a 48 percent year-over-year increase over this time (from $618 per metric ton in 2021 to $913 in 2022).

b. In its Potash segment, Nutrien reported that its average prices for its "Manufactured product" increased 113 percent year-over-year, from $296/ton in 2021 to $630/ton in 2022. Mosaic's prices mirrored similar increases: for MOP, average prices increased 121 percent from $285/ton in 2021 to $632/ton in 2022; and for all finished products, by 94 percent, from $321/ton in 2021 to $643/ton in 2022.

75. In following years, the Fertilizer prices of Nutrien and Mosaic, and those of other Defendants, followed a parallel trend: a modest decrease in 2023 followed by a rebound in 2024, with prices stabilizing well above pre-2021 levels:

a. Nutrien reported that net selling prices rose across all major Nitrogen products from 2024 to 2025, including ammonia from approximately $410 to $422 per ton in 2025, urea from approximately $421 to $490, and "[s]olutions, nitrates and sulfates" from approximately $221 to $268. Nutrien reported that its average net selling price across all of its Nitrogen products increased from approximately $324 per ton in 2024 to $365 per ton in 2025.

b. CF Industries reported similar increases: for full-year 2025, CF Industries reported increase in average selling prices, from approximately $425 per ton for ammonia in 2024 to $473 in 2025, $354 per ton for granular urea in 2024 to $443 per ton in 2025, $248 per ton for UAN in 2024 to $311 in 2025, and $286 per ton for ammonium nitrate in 2024 to $317 per ton in 2025.

c. In February 2026, Mosaic reported that its sales price had increased on DAP, a Phosphate Fertilizer, by 14.5 percent, from $585 in 2024 to $670 in 2025. Around the same time, Nutrien reported a similar increase in Phosphate Fertilizer sales prices: from an average net selling price for the first three quarters of 2024 of $611 to $677 for the same period of 2025, representing a 10.8 percent increase.

d. Similarly, in February 2026, Nutrien reported that its North American Potash net selling price rose from approximately $270 per metric ton in the fourth quarter of 2024 to approximately $305 per metric ton in the fourth quarter of 2025—an increase of roughly 13 percent. Mosaic likewise reported in February 2026 that its realized Potash prices increased from approximately $199 per ton in the fourth quarter of 2024 to approximately $264 per ton in the fourth quarter of 2025, representing an increase of approximately 33 percent.

76. The following chart created by the American Farm Bureau Federation demonstrates how the spike in prices among Nitrogen Fertilizer Products (Anhydrous Ammonia, Urea, and Liquid Nitrogen), Phosphate Fertilizer Products (DAP and MAP), and Potash Fertilizer Products beginning in 2021 departed from historic pricing norms:




77. The Producer Price Index for Nitrogen, Phosphate, and Potash Fertilizer Products confirms similar price increases:

a. <u>Producer Price Index by Industry: Nitrogenous Fertilizer Manufacturing: Synthetic Ammonia, Nitric Acid, Ammonium Compounds, and Urea, Jan. 1, 2018 to Feb. 1, 2026.</u>



b. Producer Price Index by Commodity: Chemicals and Allied Products: Phosphoric Acid, Superphosphates and Other Phosphate Fertilizer Materials, Jan. 1, 2018 to Feb. 1, 2026.




c. Producer Price Index by Industry: Potash, Soda, and Borate Mineral Mining, Jan. 1, 2018 to Nov. 1, 2022 (data after 2022 unavailable).




**2. Defendants Restricted Capacity to Inflate Prices**

78. Defendants have constricted supply in a scheme to maintain high prices—keeping production below potential output, shuttering key mines for Fertilizer inputs, and choosing not to expand production capacity when opportunities arose. Defendants did so despite consistent high demand for Fertilizer Products.




79. Defendants took these actions across all three Fertilizer types. Data shows urea production rose only 2 percent from 2017 to 2021, phosphoric acid production rose just 7 percent over the same period, and—most significantly—global Potash production *fell* 14 percent from 2021 to 2022, even as prices were at or near record highs. The 14 percent Potash production drop during a period of peak prices is evidence of Potash producers, *i.e.*, Defendants Nutrien and Mosaic, constraining output.

80. Examination of each kind of Fertilizer provides further evidence of Defendants' capacity constriction scheme. In the late 2000s, the Nitrogen Fertilizer industry began expanding capacity—minimally—for the first time in forty years. Between 2013 and 2018, a total of 31 new or expanded plants with 6.9 million metric tons of additional capacity were announced. Yet only 13 projects were completed and less than half of the declared capacity was added. Instead, only six ammonia plants were opened and seven plants expanded, representing just 3.14 million

metric tons of new Nitrogen Fertilizer production capacity, rather than the anticipated 6.9 million.

81. In 2014, Mosaic acquired competitor CF Industries' Nitrogen Fertilizer Product line. Rather than expanding capacity, Mosaic cancelled plans for CF Industries' $1.1 billion Louisiana plant. Mosaic did the same for a second plant in Florida. Rather than expand capacity, Mosaic used the savings from cancelling the production plant expansion to buy back stock.

82. Prior to the 2021 price spike, Nutrien stated that "due to historically low global ammonia prices [the company] curtailed production. . . . while maintaining flexibility to respond to improvements in the market condition."[10] In other words, Nutrien curtailed production of Nitrogen Fertilizer until they could raise the price.

83. The same is true for Potash producers, including Defendants. Since 1962, U.S. domestic Potash production has declined by 65 percent. But at the same time, demand for Potash increased. As shown in the chart below, manufacturers, including Defendants, have never responded to increased demand by producing more Potash Fertilizer:

[10] Jacqui Fatka, *DOJ Investigation Sought for Fertilizer Price Hikes* (Dec. 8, 2021), https://www.farmprogress.com/farm-operations/doj-investigation-sought-for-fertilizer-price-hikes.




84. Between 2008 and fall 2009, the price of Potash increased by 400 percent, while production decreased by 39 percent and shipments of Potash decreased by 43 percent. Many farmers were forced to decrease their use of Potash.

85. In 2018, Agrium and PotashCorp merged, forming Nutrien. After the merger, Nutrien reduced capacity, shutting down three Potash mines, some of which remain shuttered. Nutrien also announced changes to a fourth Potash mine that would lower the site's annual operational capability from 2.2 million tons of Potash to 1.7 million.

86. Nutrien further "curtailed production" in 2020.[11] In 2021, Nutrien increased production by one million tons of Potash, which "represented a small portion of our low-cost

[11] Nutrien, "Leading Solutions for Sustainable Agriculture: Nutrien Annual Report 2020" at 34, available at

available production capacity."[12] Nutrien's Potash capacity still exceeded production levels, and in 2020, the cash cost to produce Potash was $59 per ton, the lowest level on record for Nutrien. Nonetheless, Nutrien kept production well below capacity.

87. In 2023, Nutrien indefinitely suspended any plans to increase Potash production, with CEO Ken Seitz citing "unprecedented volatility" in global crop input markets as the cause.[13] Contrary to Seitz's statements, natural gas prices had fallen (to the extent they were tethered to Fertilizer prices at all). Nutrien's 2023 net earnings were $1.3 billion and the company generated an adjusted EBITDA of $6.1 billion. And the company claimed it had still "achieved record fourth-quarter potash deliveries."[14]

88. Looking into 2024, Nutrien expected "increased first quarter sales volumes compared to the prior year due to strong customer engagement to refill depleted inventories."[15]

89. Nutrien was not the only Potash producer to restrict supply. In 2019, Mosaic also shuttered several Potash mines. Mosaic kept production below full operating capacity. In 2025, Mosaic had capacity to produce 11.5 million tons of Potash per year but produced only 8.8 million tons.

90. Phosphate Fertilizer producers, *i.e.*, Defendants Nutrien and Mosaic, have likewise constricted capacity. Phosphate producers decreased in number from "11 phosphoric

---

https://cdn.sanity.io/files/ixv7nalm/production/bf661aa685bccdf831cfeae0e8a785e359e06fbd.pdf.
[12] Nutrien, "Annual Report 2021" at 5, available at https://cdn.sanity.io/files/ixv7nalm/production/eab8f308cd5ed5a14587fba8a19f70c516458f08.pdf.
[13] Mariaan Webb, *Nutrien Pauses Potash Ramp-Up Indefinitely,* Mining Weekly (Aug. 4, 2023), https://www.miningweekly.com/article/nutrien-pauses-potash-ramp-up-indefinitely-2023-08-04.
[14] Nutrien, Press Release: "Nutrien Reports Fourth Quarter and Full-Year 2023 Results" (Feb. 21, 2024), https://www.nutrien.com/news/press-releases/nutrien-reports-fourth-quarter-and-full-year-2023-results-1695.
[15] *Id.*

acid producers with 12 [million metric tons] of capacity" to only "four US phosphate producers with 7.5m mt of capacity" in 2021, with Mosaic controlling "60% of capacity."[16]

91. In 2014, the Mosaic CEO stated that "Phosphate raw material input costs are disconnected from fundamental agricultural economics . . . . In the near term, we will be margin-focused and will limit inventory build-up."[17] In 2019 Nutrien announced that it would shutter its Phosphate operations at a plant in Canada, reducing Phosphate Fertilizer production as well. Nutrien also decided to idle its Louisiana-based Phosphate operations to reduce production.

92. Capacity restrictions on Phosphate remain today. On Mosaic's Q4 2025 earnings call, the company's CEO explained that U.S. phosphate facility operating rates were well below capacity, most operating at 70 to 80 percent. According to their 2025 10-K, Mosaic's Phosphate operations have capacity to produce approximately 4.5 million tons of phosphoric acid per year but production totaled just 2.9 million tons during 2025.

### 3. Fertilizer Prices and Supply Restrictions Cannot Be Explained by Market Forces

93. Though Defendants have claimed that Fertilizer Product price hikes and supply restrictions were attributable to external forces on their supply chains and increased input costs, such as increases in natural gas prices, their financial reports reflect that the price hikes for these products far outpaced the cited increased costs and challenges.

94. Nutrien's gross manufacturing profit margin rose 669 percent from 2020 to 2021, while its cost of goods sold increased by just 58 percent. Overall, Nutrien's profits increased 1,575 percent between 2020 and 2022. Mosaic netted a 438 percent increase, and CF Industries a 955 percent increase.

---

[16] U.S. Dep't of Agriculture, Agricultural Marketing Serv., *Summary of Comments to "Access to Fertilizer: Competition and Supply Chain Concerns"* (Jan. 2023), available at https://www.ams.usda.gov/sites/default/files/media/USDAFertilizerCommentSummary.pdf.

[17] Mosaic Co., Press Release: "Mosaic Curtails Phosphate Production" (Sept. 30, 2014), https://www.prnewswire.com/news-releases/mosaic-curtails-phosphate-production-277577961.html.

95. These trends continued through 2022—Mosaic increased its 2021 profits by 120 percent, Nutrien by 142 percent, and CF Industries by 212 percent. At the same time as Fertilizer prices spiked, which Defendants attributed to higher input costs and other supply chain challenges, Defendant companies saw staggering record profits.




96. Rather, Defendants pretextually asserted that their Fertilizer price hikes were the result of increasing natural gas prices. While it is true that natural gas represents the primary input cost for Nitrogen Fertilizer production, as it is used both as the principal feedstock for ammonia synthesis and as a major source of energy in the Nitrogen Fertilizer manufacturing process, natural gas prices account for just approximately 15 percent of the variable costs for nitrogen.

97. Yara's own financial reports concede the minimal impact of increased natural gas prices: Yara's 2021 third quarter report explicitly stated that the rise in natural gas prices had a

"limited" "impact on finished fertilizer production."[18] Yara reported in 2022 quarterly reports that it experienced similar inflated profit margins due to "higher ammonia prices" and "higher production margins on ammonia."[19]




98. In May 2022, Nutrien similarly reported increased profitability in its Nitrogen sector, which it too attributed to "[h]igher net realized selling prices [that] more than offset higher natural gas costs."[20]

99. Likewise, in its 2022 Annual Report CF Industries Holdings reported a 265 percent increase in net earnings from 2021 to 2022. CF Industries Holdings claimed the increase was "due primarily to higher average selling prices partially offset by higher natural gas costs,"[21]

---

[18] Yara Int'l ASA, "Yara Third-Quarter Report 2021" at 6, available at https://www.yara.com/siteassets/investors/057-reports-and-presentations/quarterly-reports/2021/3q-2021/yara-3q-2021-report.pdf.
[19] Yara Int'l ASA, "Yara Integrated Report 2021: Growing a Nature-Positive Food Future" at 60, 177, available at https://www.yara.com/siteassets/investors/057-reports-and-presentations/annual-reports/2021/yara-integrated-report-2021.pdf.
[20] Nutrien, Press Release: "Nutrien Delivers Earnings Growth and Expects Strong Market Fundamentals in 2023" (Nov. 2, 2022), https://www.nutrien.com/news/press-releases/nutrien-delivers-earnings-growth-and-expects-strong-market-fundamentals-in-2023-1655.
[21] CF Industries Holdings, Inc., Quarterly Report on Form 10-Q for the Fiscal Quarter Ended June 30, 2021 (Aug. 9, 2021), available at https://www.sec.gov/Archives/edgar/data/1324404/000132440421000021/cf-20210630.htm.

*i.e.*, an admission that it increased prices above input costs. This is unsurprising, as Fertilizer prices rose at a far more drastic rate than natural gas prices.

100. Moreover, Defendants admit that they use natural gas derivatives and other financial mechanisms to "hedge" against increased natural gas prices:

a. CF Industries admitted in its 2024 Annual Report that it "utilize[s] natural gas derivatives to hedge [its] financial exposure to the price volatility of natural gas," which includes the use of "natural gas futures, swaps and option contracts traded in over-the-counter markets or on exchanges" as well as "fixed-price, physical purchase and sales contracts."[22]

b. In January 2025, a spokesperson for Nutrien admitted that the company "utilize[s] natural gas derivatives to manage risk associated with natural gas price changes."[23]

c. Yara has conceded the same: "In regions with efficient gas markets, we will seek exposure to spot market prices unless exceptional market circumstances clearly give reason for deviation. In regions without efficient gas markets, Yara seeks to enter into longer term contracts if favorable gas prices are obtainable."[24]

101. Increased natural gas prices and other input costs also fail to explain the sustained inflated prices for Phosphate and Potash Fertilizer Products. To begin with, it is widely recognized that Phosphate and Potash Fertilizer Product prices "are even less closely linked to natural gas than are prices for nitrogen fertilizers."[25]

102. Moreover, Mosaic admitted in 2022 that even though it paid $840 million in increased prices for input costs in the form of raw materials used in Phosphate Fertilizer production (sulfur and ammonia), its gross profit margin for its "Phosphates segment" had

---

[22] CF Industries Holdings, Inc. "Annual Report 2024", available at https://www.cfindustries.com/globalassets/cf-industries/media/documents/reports/annual-reports/cf-industries-2024-annual-report.pdf.
[23] Andrew Baker, *Industrial End Users Bracing for Natural Gas Price Volatility as Power Plants, LNG Drive Demand Growth*, Natural Gas Intelligence (Jan. 23, 2025), https://naturalgasintel.com/news/industrial-end-users-bracing-for-natural-gas-price-volatility-as-power-plants-lng-drive-demand-growth/.
[24] Yara Int'l ASA, "Enterprise Risk Management," https://www.yara.com/this-is-yara/corporate-governance/management/risk-management/ (last visited Apr. 13, 2026).
[25] Randy Schnepf, Congressional Research Serv., *Energy Use in Agriculture: Background and Issues* (Nov. 19, 2004), available at https://nationalaglawcenter.org/wp-content/uploads/assets/crs/RL32677.pdf.

increased by approximately $500 million since 2021. Nutrien likewise reported that profitability in its Phosphate segment increased in 2022 primarily due to "higher net realized selling prices" for Phosphate Fertilizer Products, which more than offset increases in production costs.

103. Nutrien and Mosaic reported similar disparities between the increases in their sales prices and input costs for Potash Fertilizer Products. Mosaic reported that its Potash segment's MOP selling price rose to $666 per ton in Q3 2022 from $290/ per ton in Q3 2021, while its gross margin per ton rose to $373 from $131. At the same time, Mosaic admitted that its cost of production rose only modestly, from $67/ton in 2021 to $78/ton in 2022. Mosaic further concedes that a portion of the cost increases included "higher price-related royalties," *i.e.*, a byproduct of its increased prices.

104. Similarly, in Nutrien's 2022 Annual Report, the company attributed its year-over-year 2022 EBIDTA gains in its Potash segment to higher sales prices while acknowledging that the bulk of its increased costs were linked to royalties arising from higher sales prices: while its "cost of product manufactured" per ton increased modestly in "Natural gas costs and carbon taxes," from $51 million in 2021 to $62 million in 2022 (a 21% increase), "royalties" linked to increased sales prices rose from $107 million in 2021 to $190 million in 2022 (a 77.5% increase).

105. Supply chain, transportation, and logistics disruptions during 2021 and 2022 also do not explain the dramatic price increases in Nitrogen, Phosphate, and Potash Fertilizer Products. To start, Nitrogen and Phosphate are not imported into the United States in substantial amounts. A University of Illinois study found that in 2024, the U.S. Fertilizer Net Import Reliance (measured as imports - exports +/- stock adjustments as % of consumption) for Nitrogen was as low as 6 percent. In 2024, the U.S. Net Import Reliance of Phosphate was only

13 percent, and that reflects recent increases that depart from the U.S.'s longstanding near-exclusive reliance on domestic Phosphate products; it was estimated that in 2022 only two percent of U.S. Phosphate Fertilizers were imported.

106. Defendants have also pretextually cited the 2022 Russian invasion of Ukraine, and subsequent sanctions on exports from Russia and Belarus, as factors necessitating the Fertilizer price hikes. However, while Russia and Belarus both produce Potash, the United States receives 80–90 percent of its imported Potash from Canada (the vast majority of which is sold by Defendants Nutrien and Mosaic). Moreover, Defendants would have been incentivized to increase supply of Potash Fertilizer in order to capture more business from firms affected by Russian and Belarusian export restrictions, which would have stemmed the rampant Fertilizer price inflation throughout 2022 and beyond. The USDA has also found that the price increase could not be attributed to the natural gas price increases caused by the conflict in Russia and Ukraine.

107. Rather, the consistent trajectory of these pricing trends across Nitrogen, Phosphate, and Potash Fertilizer prices demonstrates that Defendants adjusted prices in tandem rather than in response to conditions specific to each Fertilizer market. The variable cost structures of Nitrogen, Phosphate, and Potash Fertilizer production differ materially, both in primary input goods required (natural gas for Nitrogen; mined minerals for Potash; and mined minerals and sulfur for Phosphate) and susceptibility to international supply chain disruptions (Nitrogen and Phosphate are primarily produced domestically, whereas Potash is primarily imported). The consistent trajectory of pricing trends across Nitrogen, Phosphate, and Potash Fertilizer prices suggests that rather than adjusting prices in response to costs specific to each Fertilizer market, Defendants raised prices on a coordinated basis.

108. Economic research reveals that Fertilizer prices correlate not with natural gas prices, but with crop prices—a reflection that Fertilizer manufacturers price their products based on their assessment of what farmers are able to pay:

a. A 2015 study by USDA economists found that the correlation between natural gas and ammonia (nitrogen) Fertilizer prices decoupled in 2008, and Fertilizer prices began tracking the price o'f corn.[26]

b. A 2016 University of Illinois analysis concluded that the "tight relationship" between Fertilizer prices and natural gas prices "has not existed since 2008" and instead found that the "corn price serves as an indicator of demand for nitrogen fertilizer, with higher prices likely indicating more corn acres and the need for more nitrogen."[27]

c. Research conducted by the USDA finds that, at least until 2021, Fertilizer prices closely tracked the prices of wheat and corn.[28]

109. In 2018, Yara stated that "[v]ariations in grain prices (corn or wheat) explain approximately 50% of the variations in the urea price, making grain prices one of the most important factors driving fertilizer prices."[29]

---

[26] Beckman & S. Riche, *Changes to the Natural Gas, Corn, and Fertilizer Price Relationships From The Biofuels Era*, 47(4) Journal of Agricultural and Applied Economics, 494-509 (2015), available at https://www.cambridge.org/core/journals/journal-of-agricultural-and-applied-economics/article/changes-to-the-natural-gas-corn-and-fertilizer-price-relationships-from-the-biofuels-era/1C0E7C415B04E10BFE0BBA54105A59A5.

[27] Gary Schnitkey, "Anhydrous Ammonia, Corn, and Natural Gas Prices over Time," Farmdoc Daily (June 14, 2016), https://farmdocdaily.illinois.edu/2016/06/anhydrous-ammonia-corn-and-natural-gas-prices.html.

[28] Angelica Williams et al., U.S. Dep't of Agriculture, Econ. Research Serv., *Drivers of Fertilizer Markets: Supply, Demand, and Prices* (Sept. 2025), https://www.ers.usda.gov/sites/default/files/_laserfiche/publications/113324/ERR-354.pdf?v=83545.

[29] Yara Int'l ASA, "Yara Fertilizer Industry Handbook" (Oct. 2018), available at: https://www.yara.com/siteassets/investors/057-reports-and-presentations/other/2018/fertilizer-industry-handbook-2018-with-notes.pdf.

110. The following chart created by the American Farm Bureau Foundation demonstrates the disconnect between the price of Fertilizer and natural gas since 2008:




111. By contrast, the below chart from the American Farm Bureau Federation and Michigan Farm News showcases the historical tethering of crop and Fertilizer prices:

Figure 22
**Monthly average inflation-adjusted corn, wheat, and fertilizer prices, 2011–23**




Btu = British thermal unit.
Source: USDA, Economic Research Service using data from USDA, Agricultural Marketing Service.

112. Similarly, the following chart from Farm Action, a nonpartisan farmer watchdog, demonstrates the relationship between food and Fertilizer prices:



30

113. Several studies have linked this correlation in prices of Fertilizer and corn to the collective price power of major Fertilizer producers such as Defendants. A 2021 University of Illinois article suggested that "demand conditions and assessment of farmers' abilities to pay influence nitrogen fertilizer companies' pricing decisions."[30] A 2022 Farm Action Special Report found that "[w]hat appears more likely than global shortages is that [Fertilizer] price hikes are aligned with the rising prices farmers are able to get their grain harvest," concluding

---

[30] Gary Schnitkey et al., *Nitrogen Fertilizer Prices and Supply in Light of the Ukraine-Russia Conflict*, Farmdoc Daily (Apr. 5, 2022), https://farmdocdaily.illinois.edu/2022/04/nitrogen-fertilizer-prices-and-supply-in-light-of-the-ukraine-russia-conflict.html.

that "[i]f these corporations are tying the price of their products to the farmer's ability to pay, rather than to supply and demand, that equates to an abuse of the market."[31]

114. Defendants' price hikes coincided with an increase in farmer incomes on commodity crops. During the Class Period defined herein, Defendants began raising the prices of Fertilizer, outpacing and diverging from the price for grains. And the prices never reconvened, as Defendants continued to raise the price for Fertilizer Products. Grain prices fell back toward pre-2021 levels after 2022, while Fertilizer Product prices did not.

**4. Farmers Have Suffered Because of Defendants' Conspiracy**

115. As explained above, in 2021, already rising Fertilizer prices skyrocketed. Prices peaked in 2022 and trended slightly downward while still remaining high (still well above pre-2021 levels) throughout 2023. Prices then rose again in 2025, compounding the financial pressure on farmers.

116. At the same time, farmer debt loads have steadily risen. Federal government subsidies now consistently constitute a significant portion of U.S. farmer income, sometimes reaching or exceeding 20 percent of net farm income. Such subsidies are intended to help farmers grapple with disasters, manage risk, and develop farming practices. Instead, the subsidies have come to replace lost income and cover ballooning costs.

117. Fertilizer sits at the heart of farmers' financial struggles. One University of Illinois study found that rising Fertilizer costs lower farm incomes by 34 percent. In 2022, farmers reported that Fertilizer prices had doubled, tripled, and quadrupled. They felt they were

[31] Sarah Carden, Farm Action, *Big Fertilizer: Measuring the Impacts of Food and Farm System Concentration* (Jan. 19, 2022), https://farmaction.us/wp-content/uploads/2022/01/Big-Fertilizer_-Measuring-the-Impacts-of-Food-and-Farm-System-Concentration.pdf.

being held "hostage while we have no other options."[32] As one Iowa farmer explained, "Growers across the country are facing an impossible decision: buy fertilizer or stay solvent."[33]

118. An April 2026 American Farm Bureau Federation survey confirms that farmers continue to suffer exorbitant fertilizer prices. According to the survey, which received responses from 5,700 farmers in the United States, 70% of American farmers report that fertilizer is so expensive that they cannot afford to purchase enough fertilizer to meet their growing needs. Many farmers reported that they were planning to forgo applying fertilizer this spring in the hopes that they would be able to apply fertilizer purchased at lower prices later in the growing season.

119. Two of the nation's most important crops showcase this challenge: corn represents about 16 percent of the farm-use Fertilizer demand, with wheat a close second, representing about 15 percent. Since 2020, Fertilizer constituted 33 to 44 percent of corn operating costs and 34 to 45 percent of wheat operating costs, according to data from USDA and the American Farm Bureau Federation.

120. As shown in the American Farm Bureau Foundation chart below, Fertilizer as a percentage of production expenses has risen across all crops. Fertilizer is often the largest, or one of the largest, input costs for farmers:

[32] U.S. Dep't of Agriculture, Agricultural Marketing Serv., *Summary of Comments to "Access to Fertilizer: Competition and Supply Chain Concerns"* (Jan. 2023), available at https://www.ams.usda.gov/sites/default/files/media/USDAFertilizerCommentSummary.pdf.
[33] Chris Clayton, "Report: DOJ Looking at Fertilizer Cos.," Progressive Farmer (Mar. 5, 2026), https://www.dtnpf.com/agriculture/web/ag/crops/article/2026/03/05/iowa-corn-growers-urge-doj-press.




### 5. Market Participants and Government Officials Have Voiced Concerns that Elevated Fertilizer Prices Are the Product of Collusion

121. After the 2021 Fertilizer price spikes and before the Russian invasion of Ukraine, Senator Chuck Grassley and Farm Action sent letters to the DOJ calling for an investigation into the Fertilizer sector on suspicion of anticompetitive practices, noting that they had already observed "dramatic growth in the price of fertilizer with nitrogen fertilizers more than doubling in price, anhydrous up by 131%, urea by 110%, and potash up by 120%. In October 2021 alone, the price of anhydrous fertilizer jumped 26% from the previous month."[34]

122. In 2021, President Biden signed an Executive Order on Promoting Competition in America's Economy, which directed the USDA to investigate consolidation in the agricultural industry that was harming small family farms.

[34] Dec. 15, 2021 Ltr. from Sen. Charles E. Grassley to Attorney General Merrick Garland, available at https://www.grassley.senate.gov/imo/media/doc/grassley_to_justice_dept.fertilizer.pdf.

123. In implementing the executive order, in March 2022, the USDA solicited comments from agricultural producers regarding concentrated market power in the markets for seed, Fertilizer, other agricultural inputs, and agricultural retail. Across these requests, the USDA received more than 1,600 comments. Eighty-seven percent of commenters described concerns about high prices; 72 percent described concerns about the power of Fertilizer manufacturers; 12 percent about restrictive contract practices; and 54 percent about economic or environmental harms.

124. In January 2026 remarks during a webinar hosted by the National Agricultural Law Center, USDA Deputy Secretary Stephen Vaden stated that "the duopoly that is Mosaic and Nutrien" had "constrain[ed] fertilizer supply . . . and driv[en] up the costs that farmers are paying," adding that the administration would not allow these companies "to undermine" new market entrants seeking to increase supply.[35] Vaden observed that these two companies collectively control roughly 90 percent of Potash and Phosphate production capacity in North America, a level of concentration that he characterized as unacceptable for a critical agricultural input market.

125. Public commentary submitted to federal officials likewise highlights the anticompetitive effects of concentration in Fertilizer markets. For example, in a February 10, 2026 letter to the U.S. Attorney General, the Texas Corn Producers Association urged action in response to the Fertilizer industry consolidation, explaining that consolidation in the market had caused "the costs of the essential nutrients needed to grow [crops] to remain artificially inflated"

[35] Lyndi Allen, "USDA's Vaden Speaks Out on Nutrien, Mosaic Fertilizer Price Collusion," IL Corn (Jan. 28, 2026), https://www.ilcorn.org/usdas-vaden-speaks-out-on-nutrien-mosaic-fertilizer-price-collusion.

and describing the resulting "economic 'squeeze'" as a "threat to the viability of the family farm" as well as a "threat to our national food security."[36]

**6. The DOJ Is Investigating Anticompetitive Conduct in the Fertilizer Industry**

126. On September 26, 2025, the USDA and the DOJ signed a memorandum of understanding to cooperate "with respect to strengthening competition for agricultural inputs."[37] That same day, USDA Secretary Brooke Rollins explained that the agreement was a joint commitment from both agencies to protect farmers from the burdens imposed by high and volatile input costs for Fertilizers.

127. On March 4, 2026, *Bloomberg Law* reported that the DOJ Antitrust Division Chicago Office had launched an antitrust investigation into the United States targeting the Fertilizer-producing Defendants—Nutrien, Mosaic, CF Industries, Koch, and Yara—and examining their Fertilizer Product pricing practices as potential civil or criminal antitrust violations.

128. Following these reports, on March 12, 2026, Senator Josh Hawley sent a letter to the DOJ and Defendant CF Industries. Senator Hawley "urge[d] the Department of Justice to formally investigate potential anticompetitive conduct and price gouging in the U.S. fertilizer market."[38]

---

[36] Feb. 10, 2026 Ltr. from Hagen Hunt, Tex. Corn Producers Ass'n to Attorney General Pamela Bondi, available at https://texascorn.org/wp-content/uploads/2026/02/TCPADOJStatusLetter_021026.pdf.
[37] Mem. Of Understanding Between the Antitrust Div., Dep't of Justice and the Dep't of Agriculture Relative to Cooperation with Respect to Strengthening Competition for Agricultural Inputs (Sept. 26, 2025), available at https://www.usda.gov/sites/default/files/documents/2025-09-29-doj-usda-mou-farm-inputs.pdf.
[38] Sen. Josh Hawley, Press Release: "Hawley Sends Letter to Fertilizer Producers, DOJ Demanding Answers for Recent Price Hikes" (Mar. 12, 2026), https://www.hawley.senate.gov/hawley-sends-letters-to-fertilizer-producers-doj-demanding-answers-for-recent-price-hikes/.

### D. Multiple "Plus" Factors Reinforce the Plausibility of the Alleged Conspiracy

129. To the extent Plaintiff must plead "plus" factors that are suggestive of coordinated conduct, and thus support an inference of conspiratorial agreement between Defendants, several indicia exist including: (1) Fertilizer Products are commodity products; (2) demand for Fertilizer Products is inelastic; (3) the markets for Fertilizer Products are highly concentrated; (4) the customer base of Fertilizer Products is broad and diffuse; (5) there are substantial barriers to entry and expansion in the Fertilizer Product markets; (6) Canpotex and fertilizer industry trade associations, including Defendants IFA and TFI, afford the Fertilizer-producing Defendants opportunities to collude on pricing and output restrictions; and (7) there have been prior investigations into suspected anticompetitive conduct in the same markets alleged here.

#### 1. Fertilizers Are Commodity Products

130. Fertilizer Products are commodity products because they are highly interchangeable within each Fertilizer type, *i.e.*, each Nitrogen-producing Defendant manufactures Nitrogen Fertilizer Products that are nearly identical in terms of quality, appearance, and use, which makes them fungible in the eyes of customers. As interchangeable commodity products, Fertilizers are differentiated almost exclusively based on price.

131. Defendants all sell Fertilizer Products that adopt standard formulations. For example, each Nitrogen-producing Defendant sells Nitrogen Fertilizer Products in equivalent concentration and composition: CF Industries Holdings, Nutrien, Koch, and Yara each sell anhydrous ammonium with the standard concentration of 82 percent Nitrogen, urea in granular form with the standard concentration of 46 percent Nitrogen, and UAN solution with concentrations between 28–32 percent. Similarly, Potash Fertilizer is typically sold in MOP form, which is uniformly composed with 60 percent Potash. And common Phosphate Fertilizer

Products MAP and DAP are consistently sold with 52 percent and 46 percent concentrations of Phosphate respectively.

**2. Demand for Fertilizer Products Is Inelastic**

132. Demand for Fertilizer Products is highly inelastic because Fertilizer Products are essential inputs in agricultural production with no economically viable substitutes.

133. There are no close substitutes for Nitrogen, Phosphate, and Potash Fertilizer Products, as they are each necessary for farmers to maintain crop yields and soil productivity, and each serve distinct agronomic purposes in plant cultivation.

134. Myriad economic research has confirmed the inelasticity of demand for Fertilizer Products.

**3. The Fertilizer Industry Is Highly Concentrated**

135. The markets for Nitrogen, Potash, and Phosphate Fertilizer Products are all highly concentrated—with a similar group of companies sharing dominance in each.

136. The Nitrogen Fertilizer market rapidly consolidated, dropping from 46 separate firms in the 1980s to just 13 by the mid-2000s.

137. Defendants CF Industries, Nutrien, Koch, and Yara-USA account for 75 percent of the U.S. market share for Nitrogen Fertilizers. As of 2024, Defendant CF Industries is the largest, with 39 percent of the market, while Nutrien holds 22 percent, Koch holds 15 percent, and Yara holds 6 percent.

138. The Potash market has also consolidated rapidly, and Potash production is also controlled by an oligopoly of producers. In 2004, IMC Global and Cargill's crop nutrition division merged to create Mosaic. In 2018, PotashCorp and Agrium merged to create Nutrien. As of 2024, Nutrien controls 55 percent of the U.S. market, while Mosaic controls 35 percent.

139. The U.S. market is highly dependent on Potash imports, but the companies importing Potash into the U.S. are the same as those operating domestically: Nutrien and Mosaic account collectively for 83 percent of U.S. Potash imports.

140. The U.S. market for Phosphate Fertilizer also relies primarily on domestic supply of Phosphate: 95 percent of mined phosphate rock is turned into phosphoric and super phosphoric acid, 50 percent of which is turned into Fertilizer.

141. In 2000, there were eleven Phosphate producers, but by 2021 only four remained. Today, in the Phosphate market, Mosaic is the key player—especially after its 2013 purchase of CF Industries' phosphate business. In 2021, Mosaic produced 64 percent of the phosphate mines in the U.S. and held 90 percent of the phosphate market share.

142. A 2024 study by the Agricultural and Food Policy Center at Texas A&M University, *Concentration and Competition in the U.S. Fertilizer Industry*, calculated Herfindahl–Hirschman Index ("HHI") levels well above thresholds typically associated with concentrated markets. The study reported HHI levels of approximately 3,455 for Potash Fertilizers, 2,382 for Nitrogen Fertilizers, and 4,553 for Phosphate Fertilizers in the United States, each well above the 1,800 HHI threshold that, according to the DOJ Antitrust Division and Federal Trade Commission Horizontal Merger Guidelines, reflects that a market is "highly concentrated."

143. The following Farm Action chart illustrates the substantial concentration among Defendants in Nitrogen, Phosphate, and Potash Fertilizer Product markets:




### 4. The Fertilizer Product Customer Base is Diffuse

144. The buyer side of the Fertilizer market is highly fragmented, rendering it particularly susceptible to collusion. With a large number of purchasers, each accounting for only a small share of total sales, Defendants face little incentive to deviate from coordinated pricing, as any individual customer is relatively insignificant compared to the risk of undermining a collusive pricing structure.

145. Because the Fertilizer customer base is so broad and diffuse, few customers have any meaningful bargaining power and thus are unable to negotiate lower Fertilizer Product prices.

146. Defendants admit that their customer bases are broad and unconcentrated:

a. Nutrien, throughout its subsidiary Nutrien Ag Solutions, boasts a "network of Retail selling locations" that encompasses approximately 1,800 locations.[39]

b. Yara describes its customer base as "a variety of customers covering wholesale, co-operatives, retail and, to a lesser extent, directly to farmers."[40]

c. Mosaic admitted in 2006 that in the three-year period prior, no customer or group of customers made up more than ten percent of its customer base.

d. CF Industries acknowledged that although a single buyer, cooperative CHS Inc., accounted for 11-12% of its sales in 2016 and 2017, no other customer accounted for more than ten percent of its sales.

147. The diffuse customer base of Fertilizer Products struggles to gain pricing information and compare prices across different Fertilizer brands. Consumers have little insight into market information and pricing data for Fertilizers, as comments from the Illinois Corn Growers in 2021 explain that even "third generation" farm operations "don't know where to look for this information."[41]

148. The opacity of Fertilizer prices appears to be intentional: Yara's 2021 annual report admitted that "increased price transparency can challenge fertilizer premiums."[42]

**5. Barriers to Entry in Fertilizer Markets Inhibit New Competitors**

149. Barriers to entry in the Fertilizer industry—across the three types—are high, including the need for high levels of capital investment, access to substantial natural resources, and vertically integrated distribution networks.

150. Fertilizer production requires massive capital investment and specialized infrastructure, costing billions of dollars in upfront investments for production facilities such as

---

[39] Nutrien, "Retail," https://www.nutrien.com/about/our-business/retail (last visited Apr. 13, 2026).
[40] Yara Int'l ASA, "Yara Integrated Report 2023: Building Resilience and a Nature-Positive Food Future," available at https://www.yara.com/siteassets/investors/057-reports-and-presentations/annual-reports/2023/yara-integrated-report-2023.pdf.
[41] Comment from BlueGrass Enter., Inc. to U.S. Dep't of Agriculture, https://www.regulations.gov/comment/AMS-AMS-22-0027-0018.
[42] Yara Int'l ASA, "Yara Integrated Report 2021: Growing a Nature-Positive Food Future" at 19, available at https://www.yara.com/siteassets/investors/057-reports-and-presentations/annual-reports/2021/yara-integrated-report-2021.pdf.

complex chemical processing equipment, natural-gas supply infrastructure, environmental controls, and large industrial sites.

151. For example, construction of a Nitrogen Fertilizer plant in Wever, Iowa placed in operation in 2017 cost $1.9 billion. Likewise, Potash production facilities cost billions to construct: in 2008, it was estimated that a typical Potash mine in Saskatchewan cost $2.5 billion to construct, and more recent projects' construction costs have exceeded $5 billion.

152. Transportation and storage of fertilizer is enormously costly and requires specialized equipment and facilities. Fertilizer demand is highly seasonal—farmers need it at planting time, which creates short windows of peak demand. The ability to store large quantities in advance of this period allows distributors and retailers to build up inventory before the rush, ensuring product is available exactly when customers need it. Without adequate storage, sellers cannot meet these demand spikes.

153. Fertilizers are sensitive to moisture, temperature, and contamination. Storage of Fertilizer can be very dangerous, particularly Nitrogen-Fertilizer given its potential to cause explosions.

154. The USDA found that just three companies control 90 percent of Midwest fertilizer storage and distribution. CF Industries distributes Fertilizer through a system of terminals, warehouses, and associated transportation equipment located primarily in the Midwest. Nutrien operates approximately 440 wholesale fertilizer distribution points, including 21 terminals. Warehouses for Fertilizer storage are controlled by these companies through long-term leases, which they have used to block new entrants.

155. The story of K+S AG ("K+S"), a German Fertilizer company, showcases the stranglehold of big Fertilizer companies over manufacturing and distribution. In 2017, K+S

attempted to enter the U.S. Fertilizer market when it opened a new Potash mine in western Canada. Despite being the fifth largest global Potash seller, K+S was unable to secure a distribution and storage facility for Potash Fertilizer in the United States. K+S tried—and failed—to work with Koch Industries to secure a warehouse network. Rather, Potash Corp and Agrium (which later joined together as Nutrien), leveraged their own warehouses and long-term leases to position their Potash Fertilizer infrastructure as exclusive.

156. K+S never gained footing in the market despite its partnership with Koch. As one executive explained, "That is a very key piece of supply chain, . . . For any manufacturer of dry fertilizer, they really need to put their back into having tonnes close enough to end users."[43]

157. Farmers had hoped for something different. The then-president of the Iowa Farmers Union welcomed the idea of a new Potash mine: "It's long overdue for our farmers to have more choice."[44]

158. Beyond the production facility construction costs, competitors face difficulty breaking into retail and distribution. Nutrien and CF Industries are both vertically integrated with distribution channels and agricultural retail. Nutrien operates more than 2,000 retail locations, and 27 percent of its adjusted retail earnings come from these locations.

159. Only seven agricultural retailers, including Nutrien, control 70 percent of Fertilizer retail sales.

160. Agricultural retailers not controlled by Nutrien and CF Industries depend on relationships with Defendants to secure the necessary Fertilizer inventory. New entrants to the market struggle to find the necessary distribution networks for their product.

---

[43] Rod Nickel, *Storage Wars: New U.S. Potash Player K+S Faces Warehouse Squeeze*, Reuters (May 1, 2017), https://www.reuters.com/article/markets/currencies/storage-wars-new-us-potash-player-ks-faces-warehouse-squeeze-idUSKBN17X1L0/.
[44] *Id.*

161. Some market participants also described expansive and complete control by manufacturers over retail, transport, and production markets such that it is "the same company [which] controls every step in the process."[45]One commenter described how "large distributors" are "acquiring small manufacturers"; and "effectively lock[] up retail locations from being approached" by competitor manufacturers, by "eliminating competing products from [acquired manufacturers' catalog and consolidate to one product] and "forc[e downstream] retail locations to place large minimum orders."[46] The commenter noted how this acquisition also often "destroys local manufacturer-retailer relationships."[47]

**6. Opportunities for Collusion Exist Through Trade Associations and Canpotex**

162. Defendant Canpotex, a joint venture between Nutrien and Mosaic, offers a potent opportunity for collusion in the Fertilizer markets. Through Canpotex, the two Defendants coordinate Canadian export volumes, shipment schedules, logistics planning, and customer allocations for sales outside of North America. These functions necessarily involve Nutrien and Mosaic's joint collection and analysis of detailed data regarding their production levels, inventories, and demand conditions.

163. By consolidating export marketing functions within a jointly owned entity, Canpotex provides a forum through which these Defendants can monitor each other's market conditions and coordinate supply behavior in the Potash market. And as Nutrien and Mosaic are also each significant producers of Phosphate products, Canpotex offers Nutrien and Mosaic additional opportunities to coordinate supply and output levels of Phosphate Fertilizers as well.

---

[45] U.S. Dep't of Agriculture, Agricultural Marketing Serv., *Summary of Comments to "Access to Fertilizer: Competition and Supply Chain Concerns"* (Jan. 2023), available at https://www.ams.usda.gov/sites/default/files/media/USDAFertilizerCommentSummary.pdf.
[46] *Id.*
[47] *Id.*

164. Canpotex is deeply enmeshed with Defendants Nutrien and Mosaic. Nutrien President and CEO Ken Seitz previously served as the Canpotex President and CEO. Canpotex's President and CEO Gordon McKenzie previously served as the Vice President of Global Sales for Mosaic. Canpotex's Senior Vice President of Operations Vinesh Kohli previously served as Nutrien's Senior Director of Transportation and Distribution Commercial. In addition, Canpotex's Board includes Chris Reynolds, an Executive Vice President at Nutrien; Todd Denzin, Vice President, Commercial at Nutrien; Corrine Richard, a Senior Vice President at Mosaic; and Jenny Wang, Mosaic's Senior Vice President of Global Strategic Marketing.

165. National and global Fertilizer trade associations also bring Defendants together and provide them opportunities to collude.

166. CF Industries, Mosaic, Yara, Koch, and Nutrien are all members of the International Fertilizer Association ("IFA"), a global Fertilizer production and distribution industry organization headquartered in Paris, France. Nutrien's President and CEO Ken Seitz serves as the IFA Board Chair as well as a member of its Executive Committee; immediately before Seitz's tenure as Board Chair, Tony Will of CF Industries held the position. IFA Board also includes representatives from CF Industries (Chris Bohn, President and CEO), Mosaic (Bruce Bodine, President), and Yara (Svein Tore Holsether, President and CEO). The IFA organizes recurring in-person meetings and conferences attended by senior executives from Defendants and other Fertilizer companies, including the IFA Annual Conference, the IFA Strategic Forum, and several regional conferences and specialized technical symposia. IFA programming at these events covers topics including global Fertilizer demand forecasts, supply chain logistics, production capacity, and assessments of Fertilizer market outlooks.

167. IFA also publishes IFASTAT, which it described as the "one-stop-shop for the world's most comprehensive statistical information on fertilizer & raw materials supply and fertilizer consumption!"[48] IFASTAT boasts "15 years of global production, trade, and supply data" and "75 years of plant nutrient consumption data."[49] While IFASTAT publishes data on fertilizer consumption, it reserves access only to IFA members for fertilizer supply data and detailed "Market Outlook" reports that discuss "medium-term and short-term supply and demand."[50]

168. The same group of Defendants are all members of the trade association, The Fertilizer Institute ("TFI"), based in Arlington, Virginia. TFI is the leading U.S.-based Fertilizer industry organization. TFI hosts numerous meetings attended by Defendants' executives and commercial personnel, including the TFI Annual Business Conference, the TFI World Fertilizer Conference, the Market & Logistics Conference, and the TFI Agronomy Conference & Expo. The TFI Board of Directors currently includes representatives from Nutrien (Seitz), Mosaic (Bodine), CF Industries (Bohn), Koch (Scott McGinn, Executive Vice President), and Yara NA (Sabine Schröder, Interim President).

169. Like IFA, TFI provides its members with exclusive access to Fertilizer industry data. Through its members-only Market Intelligence program, TFI distributes industry analyses and resources addressing Fertilizer market conditions, supply chains, transportation logistics, and other factors affecting Fertilizer pricing and distribution. This includes exclusive data on

---

[48] IFASTAT, "Welcome to IFASTAT," available at https://web.archive.org/web/20260105004030/https://www.ifastat.org/ (last visited Apr. 13, 2026).
[49] Int'l Fertilizer Ass'n, "IFASTAT," https://www.fertilizer.org/ifastat/ (last visited Apr. 13, 2026).
[50] *Id.*

Fertilizer production and inventory created on a monthly basis, as well as resources such as "Takeaways" and "Talking Points" on "Fertilizer Market Volatility."[51]

170. Defendants or their wholly owned subsidiaries also all belong to Fertilizer Canada, a Canadian Fertilizer trade organization headquartered in Ottawa, Canada. Fertilizer Canada's membership includes CF Industries, Koch's wholly owned subsidiary Koch Fertilizer Canada, ULC, Mosaic, Nutrien, and Yara's wholly owned subsidiaries Yara Belle Plaine and Yara Canada Inc. Fertilizer Canada's Board includes representatives from Koch Fertilizer Canada ULC (Lindsay Kaspick), CF Industries (Stephen Jonkhans), Mosaic (Sarah Fedorchuk), Nutrien (Duncan Pottinger), and Yara NA (Mandy Huska). Fertilizer Canada provides member companies with industry resources, policy updates, and technical and market information concerning Fertilizer production, transportation, and supply chains, including materials distributed through member committees, working groups, and industry programming.

**7. Allegations of Prior Anticompetitive Conduct in the Fertilizer Industry**

171. On September 15, 2008, a class action was filed on behalf of purchasers of Potash alleging that global Potash producers jointly restricted output in order to impose price increases. *See In re Potash Antitrust Litig.*, 667 F. Supp. 2d 907, 916, 919 (N.D. Ill. 2009). The complaint named as defendants Mosaic as well as PotashCorp. and Agrium (together, modern-day Nutrien).

172. The plaintiffs alleged that the defendants had engaged in a conspiracy to fix Potash prices above competitive levels, and that such price hikes were not justified by production costs or demand. They claimed that the defendants coordinated supply restrictions and engaged in parallel conduct that was contrary to their independent economic interests, suggesting cartel-like behavior. The plaintiffs also argued that the Potash market—which has undergone little

[51] The Fertilizer Inst., "Leadership," https://www.tfi.org/about-us/leadership/ (last visited Apr. 13, 2026).

change since this case—was conducive to a cartel because of high barriers to entry and product interchangeability.

173. The court found the plaintiffs had sufficiently "allege[d] parallel production cuts which at least for some Defendants represented a 'radical change' in behavior; overlapping business ventures; specific meetings attended by Defendants which precipitated production cuts and price increases; and a 'joint sales suspension' that was contrary to Defendants' economic interests." 667 F. Supp. 2d at 937 (citation omitted).

174. The plaintiffs' claims survived a motion to dismiss, a ruling that the Seventh Circuit later affirmed. *Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845, 860 (7th Cir. 2012). The parties subsequently engaged in lengthy disputes about discovery, as the defendants continuously refused to provide key discovery. *See, e.g.*, *In Re: Potash Antitrust Litigation (No. II)*, 1:08CV06910 (N.D. Ill.), Dkt. Nos. 450, 451, 462, 463, 479, 493, 505, 517. On February 10, 2013, both Mosaic and PotashCorp announced that they had each agreed to pay $43.75 million to resolve the claims, while Agrium, Inc. agreed to pay an additional $10 million, resulting in settlements totaling nearly $100 million.

## VI. RELEVANT ANTITRUST MARKETS

175. Plaintiff need not plead a relevant market to establish liability under Section 1 of the Sherman Act where, as here, the alleged conduct constitutes a per se unlawful agreement to fix prices or restrict supply among horizontal competitors. Nevertheless, to the extent relevant markets are required, the Nitrogen, Phosphate, and Potash Fertilizer markets described below constitute relevant antitrust markets in which Defendants' conduct restrained competition.

176. Nitrogen Fertilizer, Phosphate Fertilizer, and Potash Fertilizer Products constitute relevant antitrust product markets because each type of product supplies distinct, essential nutrients to plants that meet distinct agronomic needs. As described above, Nitrogen Fertilizers

promote leaf and stem growth and support rapid vegetative development; Phosphate Fertilizers provide nutrients that plants use for energy transfer and root development, supporting early plant establishment and the formation of flowers and seeds; and Potash Fertilizers regulate water movement and enzyme activity in plants, improving stress tolerance, disease resistance, and overall crop quality. Because each Fertilizer Product serves a different need, they are not reasonably interchangeable with each other or other agricultural products used in the cultivation of plants.

177. The relevant geographic market for Nitrogen Fertilizer, Phosphate Fertilizer, and Potash Fertilizer is the United States.

## VII. STATUTE OF LIMITATIONS AND TOLLING

178. Plaintiff and members of the Class lacked actual or constructive knowledge of the claims alleged herein and could not have discovered Defendants' conspiracy through reasonable diligence until shortly before this action was filed.

179. Defendants operated a secret conspiracy to inflate Fertilizer Product prices and took affirmative steps to avoid detection—including, on information and belief, private meetings and covert communications—which prevented Plaintiff and members of the Class from learning facts that would reasonably put them on inquiry notice of their Fertilizer Product price-fixing conspiracy.

180. Public evidence of potential collusion among Defendants did not emerge until at the earliest January 2026, when Deputy Secretary Vadan raised the possibility of the alleged Fertilizer Product price-fixing conspiracy, followed by news reporting of the Department of Justice investigation in March 2026.

181. Prior to these events, Plaintiff reasonably believed that the Fertilizer Product industry was competitive. Defendants reinforced this perception by publicly characterizing the

market as "competitive" in corporate disclosure statements made during the Class Period. For example, Nutrien stated in its 2022 Annual Information Form: "Markets for phosphate Fertilizer Products are highly competitive and based largely on price, reliability and deliverability."[52] Similarly, in Mosaic's 2023 annual report, the company described the Potash and Phosphate Fertilizer markets as "highly competitive."[53]

182. As a result of this fraudulent concealment, the statute of limitations is tolled for Plaintiff and members of the Class with respect to the claims alleged herein.

183. Defendants' conspiracy to inflate Fertilizer Product prices also represents a continuing violation of antitrust law, in which each sale of a Fertilizer Product at an artificially inflated price constitutes an overt act in furtherance of the conspiracy that inflicted new and accumulating injury on Plaintiff and members of the Class. Thus, each sale of a Fertilizer Product at a price that was artificially inflated by Defendants' conspiracy restarts the statute of limitations, so the claims of Plaintiff and members of the proposed Class are not time-barred.

## VIII. CLASS ALLEGATIONS

184. Plaintiff brings this action on behalf of itself and as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the following class (the "Class"):

> All persons and entities in the United States and its territories who purchased Fertilizer Products directly from any Defendants or their subsidiaries, predecessors, affiliates, and/or agents during the period beginning no later than January 1, 2020 and running until the date on which any Class is certified in this action or the anticompetitive effects of Defendants' conduct cease. Excluded from the Class are Defendants, their parents, affiliates, subsidiaries, officers, directors,

---

[52] Nutrien, "Annual Information Form: Year Ended December 31, 2022" at 16 (Feb. 16, 2023), available at https://nutrien-prod-asset.s3.us-east-2.amazonaws.com/s3fs-public/uploads/2023-02/2022%20Nutrien%20Annual%20Information%20Form.pdf.

[53] Mosaic, "2023 Annual Report," available at https://s1.q4cdn.com/823038994/files/doc_financials/2023/ar/2023-annual-report_final.pdf.

employees, assigns, successors, agents, and co-conspirators, and the Court and its staff.

185. ***Numerosity.*** Plaintiff does not know the exact number of members of the Class but, given Defendants' substantial nationwide presence and the large number of Fertilizer purchasers in the United States, Plaintiff believes the class size is so numerous that joinder is impracticable.

186. ***Commonality.*** Common questions of law and fact exist as to all members of the Class. This is particularly true given the nature of Defendants' unlawful conduct, which was generally applicable to all members of the Class, thereby making relief for the Class as a whole appropriate. Such questions of law and fact common to the Class include, but are not limited to:

a. Whether Defendants and their co-conspirators entered into and engaged in a combination and conspiracy among themselves to fix, raise, maintain, and/or stabilize prices for Fertilizers sold in the United States;

b. The identities of the participants in the alleged conspiracy;

c. The duration of the alleged conspiracy;

d. The specific acts carried out and specific statements made by Defendants and their co-conspirators in furtherance of the alleged conspiracy;

e. Whether the alleged conspiracy violated Sections 1 and 3 of the Sherman Act;

f. Whether the alleged conduct of Defendants and their co-conspirators caused injury to the business or property of Plaintiff and members of the Class;

g. The effect of the alleged conspiracy on Fertilizer prices during the Class Period;

h. Whether Defendants and their co-conspirators fraudulently concealed the existence of the alleged conspiracy from Plaintiff and members of the Class;

i. The appropriate equitable relief for Plaintiff and members of the Class; and

j. The appropriate classwide measure of damages.

187. ***Typicality.*** Plaintiff's claims are typical of the claims of all members of the Class. Plaintiff and all members of the Class are similarly affected by Defendants' unlawful conduct in

that they paid artificially inflated prices for Fertilizers purchased from Defendants or their co-conspirators.

188. ***Adequacy.*** Plaintiff and their undersigned counsel will fairly and adequately protect the interests of the Class. Plaintiff's claims arise out of the same common course of conduct that gives rise to the claims of the other members of the Class. Plaintiff's interests align with, and are not antagonistic to, the interests of the other members of the Class. Plaintiff is represented by competent counsel who are experienced in the prosecution of antitrust class action litigation.

189. ***Predominance.*** Questions of law and fact common to Plaintiff and all members of the Class—including the legal and factual questions relating to Defendants' liability and the measure of damages described above—predominate over any questions affecting only individual members of the Class.

190. ***Superiority.*** Class treatment is the superior method for the fair and efficient adjudication of this controversy. It will allow a large number of similarly situated persons and entities to pursue their common claims in a single forum, avoiding the unnecessary duplication of evidence, effort, and expense that numerous individual actions would entail and providing a practical means of obtaining redress for claims that would be impracticable to pursue individually. Separate actions by individual Class members would also risk inconsistent judgments and the imposition of incompatible standards of conduct on Defendants. The benefits of the class mechanism thus substantially outweigh any potential difficulties in managing this class action.

# IX. CAUSES OF ACTION

## Count 1

### Price Fixing of Nitrogen Fertilizers in Violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) Against CF Industries, Nutrien, Koch, Yara, and Un-Named Co-Conspirators (the "Nitrogen Defendants")

191. Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.

192. Beginning at a time currently unknown to Plaintiff, but no later than January 2020, the Nitrogen Defendants entered into and engaged in a conspiracy in restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

193. The contract, combination, or conspiracy consisted of an agreement among the Nitrogen Defendants to fix, raise, stabilize, or maintain artificially high prices for Nitrogen Fertilizer Products in the United States.

194. The Nitrogen Defendants' conspiracy had the following anticompetitive effects, among others:

a. restraining and/or eliminating price competition in the U.S. Nitrogen Fertilizer market;

b. fixing, raising, stabilizing, or maintaining prices for Nitrogen Fertilizers at artificially high levels throughout the United States; and

c. depriving Plaintiff and members of the Class of the benefits of free and open competition in the market for Nitrogen Fertilizers.

195. Plaintiff and members of the Class have been injured, and will continue to be injured, in their business or property by paying more for Nitrogen Fertilizers purchased from Defendants and their co-conspirators in the United States than they would have paid absent the conspiracy.

196. The Nitrogen Defendants' conspiracy constitutes a per se violation of the federal antitrust laws. The Nitrogen Defendants' conduct also violates federal antitrust laws when

assessed under either the "quick look" or rule of reason standards because the Nitrogen Defendants' conspiracy is anticompetitive and lacks procompetitive justifications (and alternatively, those justifications could have been achieved through lesser restrictive means of competition).

197. Plaintiff and members of the Class are entitled to treble damages, as well as injunctive relief preventing and restraining Defendants from continuing the violations alleged herein.

**Count 2**

**Price Fixing of Phosphate Fertilizers in Violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) Against Nutrien, Mosaic, and Un-Named Co-Conspirators**

198. Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.

199. Beginning at a time currently unknown to Plaintiff, but no later than January 2020, the Phosphate Defendants entered into and engaged in a conspiracy in restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

200. The contract, combination, or conspiracy consisted of an agreement among the Phosphate Defendants to fix, raise, stabilize, or maintain artificially high prices for Phosphate Fertilizer Products in the United States.

201. The Phosphate Defendants' conspiracy had the following anticompetitive effects, among others:

a. restraining and/or eliminating price competition in the U.S. Phosphate Fertilizer market;

b. fixing, raising, stabilizing, or maintaining prices for Phosphate Fertilizers at artificially high levels throughout the United States; and

c. depriving Plaintiff and members of the Class of the benefits of free and open competition in the market for Phosphate Fertilizers.

202. Plaintiff and members of the Class have been injured, and will continue to be injured, in their business or property by paying more for Phosphate Fertilizers purchased from Defendants and their co-conspirators in the United States than they would have paid absent the conspiracy.

203. The Phosphate Defendants' conspiracy constitutes a per se violation of the federal antitrust laws. The Phosphate Defendants' conduct also violates federal antitrust laws when assessed under either the "quick look" or rule of reason standards because the Phosphate Defendants' conspiracy is anticompetitive and lacks procompetitive justifications (and alternatively, those justifications could have been achieved through lesser restrictive means of competition).

204. Plaintiff and members of the Class are entitled to treble damages, as well as injunctive relief preventing and restraining Defendants from continuing the violations alleged herein.

## Count 3

### Price Fixing of Potash Fertilizers in Violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) against Nutrien, Mosaic, Canpotex, and Un-Named Co-Conspirators

205. Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.

206. Beginning at a time currently unknown to Plaintiff, but no later than January 2020, the Potash Defendants entered into and engaged in a conspiracy in restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

207. The contract, combination, or conspiracy consisted of an agreement among the Potash Defendants to fix, raise, stabilize, or maintain artificially high prices for Potash Fertilizer Products in the United States.

208. The Potash Defendants' conspiracy had the following anticompetitive effects, among others:

a. restraining and/or eliminating price competition in the U.S. Potash Fertilizer market;

b. fixing, raising, stabilizing, or maintaining prices for Potash Fertilizers at artificially high levels throughout the United States; and

c. depriving Plaintiff and members of the Class of the benefits of free and open competition in the market for Potash Fertilizers.

209. Plaintiff and members of the Class have been injured, and will continue to be injured, in their business or property by paying more for Potash Fertilizers purchased from Defendants and their co-conspirators in the United States than they would have paid absent the conspiracy.

210. The Potash Defendants' conspiracy constitutes a per se violation of the federal antitrust laws. The Potash Defendants' conduct also violates federal antitrust laws when assessed under either the "quick look" or rule of reason standards because the Potash Defendants' conspiracy is anticompetitive and lacks procompetitive justifications (and alternatively, those justifications could have been achieved through lesser restrictive means of competition).

211. Plaintiff and members of the Class are entitled to treble damages, as well as injunctive relief preventing and restraining Defendants from continuing the violations alleged herein.

## X. REQUEST FOR RELIEF

212. Plaintiff, on behalf of itself and members of the Class, respectfully requests that the Court:

a. determine that this action may be maintained as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure; appoint Plaintiff as Class representative; and direct that reasonable notice be provided to Class members pursuant to Rule 23(c)(2);

b. adjudge and decree that the contract, combination, or conspiracy alleged herein, and the acts taken in furtherance thereof by Defendants and their co-conspirators, constitute a *per se* violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3);

c. permanently enjoin and restrain Defendants, together with their successors, assigns, parents, subsidiaries, affiliates, transferees, officers, directors, agents, employees, and all persons acting in concert with them, from directly or indirectly continuing, maintaining, or renewing the unlawful conduct alleged herein, or entering into any similar contract, combination, or conspiracy, or adopting any plan, program, or device with a similar purpose or effect;

d. permanently enjoin and restrain Defendants, their successors, assigns, parents, subsidiaries, affiliates, transferees, officers, directors, agents, and employees, and all persons acting on their behalf or in concert with them, from directly or indirectly continuing, maintaining, or renewing the unlawful conduct, contract, combination, or conspiracy alleged herein, or engaging in any similar conduct or entering into any similar contract, combination, or conspiracy, or adopting any practice, plan, program, or device with a similar purpose or effect;

e. enter judgment against Defendants, jointly and severally, and in favor of Plaintiff and the Class, for treble damages as provided by law, together with the costs of this action, including reasonable attorneys' fees, and pre- and post-judgment interest at the maximum legal rate from the date of service of the first-filed complaint in this action to the extent permitted by law; and

f. grant Plaintiff and the Class such other and further relief as the nature of the case may require and as the Court deems just and proper under the circumstances.

## XI. JURY DEMAND

213. Plaintiff demands a trial by jury on all issues so triable pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

DATED: April 16, 2026

Respectfully submitted,

/s/ *Michael Dell'Angelo*

Michael Dell'Angelo (N.D Ill. Bar No. PA80910)
Candice J. Enders (*pro hac vice* forthcoming)
Jeremy Gradwohl (*pro hac vice* forthcoming)
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
mdellangelo@bergermontague.com
cenders@bergermontague.com
jgradwohl@bergermontague.com

Richard D. Schwartz (ARDC# 6323474)
BERGER MONTAGUE PC
110 N. Wacker Drive, Suite 2500
Chicago, IL 60606
Telephone: (773) 257-0255
rschwartz@bergermontague.com

E. Michelle Drake (N.D. Ill. Bar No. 229202)
BERGER MONTAGUE PC
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
Telephone: (612) 594-5933
emdrake@bergermontague.com

Jessica Seigel (*pro hac vice* forthcoming)
BERGER MONTAGUE PC
505 Montgomery Ave., Suite 625
San Francisco, CA 94111
Telephone: (415) 707-6801
jseigel@bergermontague.com

*Attorneys for Plaintiff Red River Ag, LLC*